UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BRIAN EBNER,<br>Derivatively on Behalf of<br>Nominal Defendant AUDIBLE, INC.,<br>COMPANY, INC., | : <br> : <br> : <br> : <br> : <br> : <br> : | Civil Action No.: |
| Plaintiff | : | |
| vs. | : <br> : | |
| GARY GINSBERG, ANDREW P. KAPLAN,<br>DONALD R. KATZ, WINTHROP<br>KNOWLTON, JOHANNES MOHN, ALAN<br>PATRICOF, RICHARD SARNOFF,<br>WILLIAM H. WASHECKA, and<br>OREN ZEEV, | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| Defendants, | : <br> : | |
| -and- | : <br> : | |
| AUDIBLE, INC.,<br>a Delaware corporation, | : <br> : <br> : | |
| Nominal Defendant. | : | |

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Derivative Complaint (the "Complaint")

against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of nominal

defendant Audible, Inc. ("Audible" or the "Company"), against certain of its current and/or

former officers and directors, seeking to remedy defendants' breaches of fiduciary duties.

1

## JURISDICTION AND VENUE

2.      This court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs.  This

action is not a collusive one to confer jurisdiction on a court of the United States which it

otherwise would not have.

3.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) insofar as a

substantial part of the events or omissions giving rise to the claim occurred within this judicial

district.

## PARTIES

4.      Plaintiff Brian Ebner, a Wisconsin citizen, is the owner of Audible common

stock, which he has held at all times relevant hereto.

5.      Defendant Audible is a provider of Internet audio information and entertainment

service that specializes in the spoken word, selling membership-based spoken audio content,

such as audio versions of books, newspapers, magazines, original productions and public radio

subscriptions.  Its integrated spoken audio delivery service includes five components: its

Website, audible.com; a collection of digital audio content; a software for securing,

downloading, managing, transferring, burning and playing audio selections; a variety of

AudibleReady players, which include its technology and features that manage the listening

experience, and other services, which are provided to over 50 public library and school library

systems.  Audible offers its customers the opportunity to join AudibleListener, a monthly

membership service.  For a fixed monthly fee, AudibleListener customers may download their

choice of programs from the Company's Website.  Audible's principal executive offices are

2

located at 65 Willowbrook Boulevard, Wayne, New Jersey 07470.

6.      Defendant Gary L. Ginsberg ("Ginsberg") has served on the Audible Board of Directors (the "Board") at all times relevant hereto.  Ginsberg has also served as the Chairman of the Board's Audit Committee (the "Audit Committee") at all times relevant hereto.  Upon information and belief, Ginsberg is citizen of Connecticut.

7.      Defendant Andrew P. Kaplan ("Kaplan") has served as a director on the Board, and as the Company's Chief Financial Officer and Executive Vice President at all times relevant hereto.  Upon information and belief, Kaplan is a citizen of New Jersey.

8.      Defendant Donald R. Katz ("Katz") has served as the Chairman of the Board and as the Company's Chief Executive Officer at all times relevant hereto.  Upon information and belief, Katz is a citizen of New Jersey.

9.      Defendant Winthrop Knowlton ("Knowlton") has served as a director on the Board at all times relevant hereto.  Knowlton has served on the Audit Committee at all times relevant hereto.  Upon information and belief, Knowlton is citizen of New York.

10.     Defendant Johannes Mohn ("Mohn") has served as a director on the Board at all times relevant hereto.  Upon information and belief, Mohn is a citizen of Germany.

11.     Defendant Alan Patricof ("Patricof") has served as a director on the Board at all times relevant hereto.  Upon information and belief, Patricof is citizen of New York.

12.     Defendant Richard Sarnoff ("Sarnoff") has served as a director on the Board at all times relevant hereto.  Sarnoff has served on the Audit Committee at all times relevant hereto.  Upon information and belief, Sarnoff is a citizen of New York.

13.     Defendant William H. Washecka ("Washecka") has served as a director on the Board at all times relevant hereto.  Upon information and belief, Washecka is a citizen of

3

Maryland.

14.    Defendant Oren Zeev ("Zeev") has served as a director on the Board at all times relevant hereto.  Upon information and belief, Zeev is a citizen of California.

15.    Collectively, the defendants identified in paragraphs 6-14 will be referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

16.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

17.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

18.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and

4

controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

        a.      ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; and

        b.      ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public.

19.      In addition to the foregoing, the Company's 2004 Annual Proxy disclosed the following with respect to the duties of the directors who serve on the Audit Committee:

> The audit committee met six (6) times during 2003. The Audit Committee provides the opportunity for direct contact between our independent accountants and the board of directors, engages the independent accountants to audit our financial statements, discusses the scope and results of the audit with the independent accountants, reviews with our management and the independent accountants our interim and year-end operating results, considers the adequacy of the internal accounting controls and audit procedures and oversees our financial reporting process.

20.      The Individual Defendants  breached their duties of loyalty and good faith by: (i) causing or allowing the Company to conduct its business in an unsafe, imprudent, and unlawful manner; (ii) improperly abdicating their duties; and (iii) causing Audible to suffer damages, as alleged herein.

## SUBSTANTIVE ALLEGATIONS

21.      On  November 2, 2004 the Individual Defendants caused Audible to issue a press release announcing its results for the Company's third fiscal quarter of 2004.  In part, the press

5

release disclosed:

> -- Total revenue of $9.3 million, up 87% over the third quarter of 2003 and 15% over the second quarter of 2004.
>
> -- Net content and services revenue of $9.0 million, up 88% over the third quarter of 2003 and 14.5% over the second quarter of 2004.
>
> -- Net income of $483,884 and EPS of $0.02.
>
> -- Free cash flow(*) of$1.0 million, compared to ($593,000) cash used in the third quarter of 2003 and $611,000 in the second quarter of 2004.
>
> -- The addition of 40,566 new customers, of which 31,726, or a record 78%, were AudibleListener members. Newly acquired AudibleListeners rose 29% over the second quarter of 2004.

Commenting on the results, defendant Katz touted the Company's membership gains, strong operational performance and strategic advances, stating as follows:

> "Our success converting one-time buyers and free content users to AudibleListener membership is reflected in the numbers and percentage of new AudibleListener customers versus the total new customers. The strong operational performance in the quarter was matched by important strategic advances, notably our announcement of imminent operations in both France and Germany and our exciting partnership with Sprint, Audible's first major wireless carrier technology and co-marketing alliance."

22.     Later that same day, some of the Individual Defendants participated in a conference call with analysts regarding the Company's third quarter results and the Company's future prospects. During the call, the defendants reiterated the positive comments made in the November 2nd press release. In relevant part, defendant Katz represented that "The key metrics associated with our business all point to a strong finish to 2004 and solid momentum as we look out to 2005."

23.     Shortly after issuing the highly positive third quarter earnings release and conference call, on November 18, 2004, the Individual Defendants caused Audible to commence a secondary offering of 5,225,000 shares of common stock at $24.50 per share (the "Secondary

Offering") The Company sold 1,500,000 shares in the Secondary Offering, and the remaining 3,725,000 shares were sold by certain selling stockholders including defendants Kaplan (125,000 shares for total proceeds of $3,062,500) and Katz (150,000 shares for total proceeds of $3,675,000).

24.     The Individual Defendants caused the Company to publish an offering registration statement and a prospectus for the Secondary Offering (collectively, the "Prospectus"), which reported that "[w]ith respect to the shares offered by Audible[], the proceeds will be used by us for general corporate purposes and potential acquisitions. Audible will not receive any proceeds from the sale of the shares offered by the selling stockholders." The Prospectus was filed with the SEC and signed by defendants Kaplan and Katz.

25.     The Prospectus also reported that the Company is an industry leader poised for continuing growth:

> Audible is the Internet's largest, most diverse provider of premium spoken audio services for content download and playback on personal computers, CD or AudibleReady mobile listening devices. Our customers purchase and download their choice of content, and generally listen during their daily commute or while exercising, when "their eyes are busy but their minds are free." We believe that the Audible service allows our customers to make better use of their time, allowing them to listen to books, newspapers and magazines that, due to their busy lives, they would not have the time to read, as well as to listen to time shifted radio programs on their own schedules. Our online store is located at www.audible.com and our single location of operations is in Wayne, New Jersey. Audible.com is also the Apple iTunes Music Store's exclusive provider of spoken word content for digital distribution.
>
> Audible has more than 55,000 hours of audio programs and over 165 content providers that include leading audio book publishers, broadcasters, entertainers, magazine and newspaper publishers and business information providers. Most of our customers join the AudibleListener program, where for a monthly fee of either $14.95 or $21.95, they may download and listen to a prescribed number of audio titles of their choice. AudibleListeners provide us with their credit card information and are billed monthly in advance for the AudibleListener service. Customers may also purchase individual audio titles from us on an a la carte basis.

Since launching the service in 1997, over 420,000 customers in 120 countries have purchased content at audible.com. We believe our growth has been driven primarily by our strong collection of content, by the growing trends of downloading and listening to audio on-the-go, and by the growing market for digital audio devices that securely play content from Audible.com. We promote the Audible service through co-marketing partnerships with device manufacturers, online promotions, promotions with retailers and our customer-get-customer referral program. For example, customers at Amazon.com and the Apple iTunes music store can purchase and download Audible content of their choice.

The key drivers of our business include new customer growth, the cost of acquiring a customer, our customer cancellation rate, controlling our costs and sales of Audible content through the Apple iTunes music store. Our new customer growth is a function of developing compelling advertising and promotion programs to encourage people to try the Audible service for the first time, as well as the creation of marketing partnerships that similarly encourage consumers to try our service. One of our growing sources of new AudibleListeners is via our device rebate program. Under this program, AudibleListeners that subscribe to our AudibleListener service for twelve months qualify for a $75 or $100 rebate on certain AudibleReady device purchases. Other sources of new AudibleListeners include our "tell a friend" customer-get-customer program and our marketing efforts directed at converting a la carte purchasers to AudibleListener members. We manage customer acquisition costs by entering primarily into co-marketing deals where we pay for results, rather than advertising impressions. We believe that our customer cancellation rate is minimized by providing our customers with a wide range of high value content, a compelling value proposition and solid customer service.

26.      However, at the time of the Secondary Offering, the Individual Defendants had decided that the Company needed to embark to expensive strategic initiatives that would purportedly transform Audible's business in the long term, but would severely erode the Company's earnings in the short term. The new strategic imitative was not disclosed in the Prospectus even though the Individual Defendants listed twenty one (21) other factors that could effect the Company's business in the future.

27.      On February 15, 2005, after the close of trading, the Individual Defendants caused Audible to issue a press release announcing the Company's results for its fourth fiscal quarter of 2004. In part, the press release disclosed:

Revenue. Revenue for the fourth quarter increased to $10.3 million, up 77% over the fourth quarter of 2003 and 11 % over the third quarter of 2004. Total revenue for 2004 grew to $34.4 million, up 78% over $19.3 million reported in total revenue for 2003.

Free cash flow *. Free cash flow for the fourth quarter increased to $2.2 million, up 309% over the fourth quarter of 2003 and 124% over the third quarter of 2004. For 2004, total free cash flow was $4.2 million, as compared to negative $1.3 million in 2003.

Net Income. Net income for the fourth quarter was $1.4 million or $0.06 per share, as compared to $24,000, before preferred stock charges, in the fourth quarter of 2003 and $484,000 or $0.02 per share in the third quarter of 2004. Net income for 2004, before preferred stock charges, was $2.2 million, as compared to a $3.6 million loss in 2003.

Balance Sheet. Cash, cash equivalents, and short term investments were $61.7 million at the end of 2004, as compared to $9.1 million at the end of 2003. This reflects the successful completion of a shelf offering of 2,022,500 shares on November 23, 2004, that raised $46.5 million in net proceeds to the Company.

New AudibleListener Members. The addition of 41,600 new AudibleListener members set a new record and represents a 115% gain over the fourth quarter of 2003 and a 31 % gain over the third quarter of 2004. The new AudibleListener members acquired in the quarter represented 88% of more than 47,500 total customer additions in the third quarter of 2004.

28.    In addition, the press release disclosed certain new strategic initiatives which

would require substantial, material investments in the Company's infrastructure, new business

units and marketing, among other areas.   In relevant part, defendant Kaplan represented as

follows:

"We believe that now is the time to step up our investment in our people, infrastructure, customer service operation, marketing, technology innovations such as wireless delivery, and in the launch of new business units," said Andy Kaplan, Audible's Chief Financial Offer. "Our proven core business will generate the revenue growth we expect in 2005, while allowing us to develop significant new revenue streams -and to still generate a solid stream of positive free cash flow and profit."

As is evidenced by the Company's guidance for 2005, the initiatives were expected to materially reduce Audible's earnings and free cash flow:

The Company's guidance for 2005 is for total revenue to increase to the range of $59 million to $62 million, which represents 71 % to 80% year-over-year revenue growth. Income before income taxes for 2005 is expected to be in the range of $3.6 million to

$4.0 million before deducting an expected $2 million expense related to the launch of Audible UK and before deducting any charges related to share-based expense. Capital expenditures in information technology infrastructure are expected to be in the range of $2.7 to $3.3 million. Free cash flow for 2005 is expected to be in the range of $1.6 million to $2.0 million.

By comparison, free cash flow in 2004 was reportedly $4.2 million, while net income was reportedly $2.2 million in 2004.

29.    In direct reaction to this announcement, the price of Audible common stock plummeted, falling from $26.70 per share on February 15, 2005 to $17.32 on February 16, 2005, a one-day decline of 35%, on unusually heavy trading volume of 20.9 million shares.

30.    Analysts and industry commentators expressed concern over the announcement, noting that it would weigh heavily on the Company's stock price. As reported by *Forbes.com*, analysts downgraded Audible stock in reaction to the announcement which was said to have shaken investor confidence in the Company:

Adams Harkness downgraded Audible (nasdaq: ADBL - news - people) to "market perform" from "buy" after the online content provider announced plans to significantly increase investments in 2005. "Management's strategic decision to double-down-- investing in new businesses such as wireless and education--should eliminate the hoped- for margin ramp in 2005," said Adams Harkness. "While revenue guidance is higher than the consensus, these investments wreck earnings and, in our opinion, the stock." Audible plans to launch operations in the U.K., at a cost of $2 million in 2005, open an education business and deliver content via wireless networks. The research firm slashed 2005 and 2006 earnings-per-share estimates to 8 cents and 30 cents from 40 cents and 65 cents, respectively. "Separately, we cannot disagree with the wisdom of any of these investments. However, in combination, they serve to wipe out the anticipated margin improvement in 2005, lead to year-over-year earnings declines and destroy investor confidence," it said. "We believe it will take several quarters to rebuild investor confidence and therefore are moving to the sidelines."

31.    On February 23, 2005, the Individual Defendants caused the Company to issue a Current Report on Form 8-K which disclosed the following:

On February 22, 2005, a purported class action complaint was filed in the United States District Court for the District of New Jersey by Dennis Carter on behalf of himself and

10

all other similarly situated investors against Audible, Inc., its Chief Executive Officer and Chief Financial Officer. The complaint alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Securities and Exchange Commission Rule 10b-5, and alleges that the defendants did not make complete and accurate disclosures concerning the Company's future plans and prospects. The plaintiff seeks unspecified damages on behalf of a purported class of purchasers of Audible's securities during the period from November 2, 2004 through February 15, 2005. It is possible that additional complaints may be filed in the future. Audible expects that all individual lawsuits will be consolidated into a single civil action. Audible believes that the complaint is without merit and intends to defend the litigation vigorously.

32.      On March 7, 2005, Audible stockholders received yet another shock when the

Individual Defendants caused the Company to file a Form 12b-25 which disclosed, *inter alia*,

that the Company would not be able to timely file its Annual Report on Form-10-K for fiscal

2004 due to material weaknesses in internal controls.  The Form 12b-25 disclosed:

> We are unable to timely file our annual report on Form 10-K for the year ended December 31, 2004 without unreasonable effort or expense because of the significant effort required in order to meet the accelerated filing date. As a result, we have not yet completed our financial statements and related disclosures for our annual report on Form 10-K for the year ended December 31, 2004; nor have we completed our evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2004. During 2004 and through the date of the filing of this Notice, management has spent considerable time and resources analyzing, documenting and testing its system of internal control. This evaluation of internal control over financial reporting has not yet been completed and we do not expect to have it completed by the time we file our annual report. We will rely on SEC Release No. 34-50754 (Order Under Section 36 of the Securities Exchange Act of 1934 Granting an Exemption from Specified Provisions of the Exchange Act Rule 13a-1 and 15d-1), and afford ourselves of the 45 day extension to present our report on internal control over financial reporting. However, to date, we have identified material weaknesses involving internal controls over accounting for our retail promotion program, internal controls over accounting for content costs, and internal controls over our financial statement closing process. Because of these material weaknesses, management has concluded our internal control over financial reporting was not effective as of December 31, 2004. As a result, we expect that when we issue our amended Form 10-K, our independent registered public accounting firm will issue an adverse opinion on the effectiveness of internal control over financial reporting. We may identify additional control deficiencies in our internal control over financial reporting as we continue our assessment. We are working diligently to finalize and file our annual report on Form 10-K as soon as possible.

33.     On March 31, 2005, the Individual Defendants caused the Company to file its

Annual Report on Form 10-K for fiscal year 2004 (the "2004 10-K"). In part, the 2004 10-K

disclosed:

> Following our fourth quarter and year end earnings release on February 15, 2005, as a
> result of internal control and audit testing conducted in connection with our required
> review under Section 404 of the Sarbanes-Oxley Act of 2002, we identified certain errors
> in our financial statements, resulting in a net charge of approximately $190,000.
> Accordingly, our fourth quarter and full year 2004 earnings, as reflected in our February
> 15, 2005 earnings release, have been reduced by approximately $190,000. Our net
> income for 2004 was $2,024,698, as compared to our previously announced net income
> of $2,214,429. The revised results are reflected in our audited financial statements
> included in this Form 10-K. The principal error related to the way we accounted for our
> retail promotion program, as further described in Item 9A of this Form 10-K.
>
> We are working to comply with the requirements of Section 404 of the Sarbanes-Oxley
> Act of 2002 which requires us to report on management's assessment of the effectiveness
> of the our internal control over financial reporting as of the end of the fiscal year.
> Additionally, our independent registered public accounting firm will issue reports on
> management's assessment of our internal control over financial reporting and on the
> operating effectiveness of management's internal control over financial reporting.
> Pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, our management,
> including our Chief Executive Officer and Chief Financial Officer, supervised and
> participated in the performance of an evaluation of the effectiveness of the design and
> operation of our disclosure controls and procedures as of the end of the period covered by
> this report. Based on that evaluation, our management, including the Chief Executive
> Officer and Chief Financial Officer, concluded that our disclosure controls and
> procedures were not effective in alerting them in a timely fashion to material information
> required to be included in our periodic filings with the Securities and Exchange
> Commission, due to the material weaknesses in internal control over financial reporting,
> as described in further detail in Item 9A.
>
> In reliance on SEC Release No. 34-50754 (Order Under Section 36 of the Securities
> Exchange Act of 1934 Granting an Exemption from Specified Provisions of the
> Exchange Act Rule 13a-1 and 15d-1)(the "Order"), which allows us a 45 day extension
> to present our report on internal control over financial reporting, we have not included in
> this report on Form 10-K management's annual report on internal control over financial
> reporting and the related attestation report of our independent registered public
> accounting firm. We intend to file an amendment to this report on Form 10-K containing
> the omitted management annual report and auditor attestation not later than May 2, 2005.
>
> In conjunction with our continued progress toward compliance with Section 404 of the
> Sarbanes-Oxley Act of 2002, through the date of this report, we have identified three

material weaknesses in internal control over financial reporting as described in Item 9A of this Form 10-K. We are using the framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control-Integrated Framework, in conducting our assessment, but we have not yet completed our assessment of the effectiveness of our internal control over financial reporting. We have identified material weaknesses involving internal controls over accounting for our retail promotion program, internal controls over accounting for content costs, and internal controls over our financial statement closing process. See Item 9A for additional details regarding these material weaknesses. As a result, we expect that our independent registered public accounting firm will issue an adverse opinion on the effectiveness of internal control over financial reporting.

Although we are in the process of implementing new controls to remediate these material weaknesses, we cannot assure you that any of the measures we implement will effectively mitigate or remediate such material weaknesses. In addition to the material weaknesses described above, during the third quarter of 2004 we identified significant deficiencies in segregation of duties in the financial area and an inadequate vacation accrual record-keeping system. We have remediated these deficiencies prior to year-end. We or our independent registered public accounting firm may identify additional deficiencies, significant deficiencies or material weaknesses in our internal controls.

Achieving compliance with Section 404 within the prescribed period, and remedying the material weaknesses we have identified and any additional deficiencies, significant deficiencies or other material weaknesses that we or our independent registered public accounting firm may identify, will require us to incur significant costs and expend significant time and management resources. We cannot assure you that any of the measures we implement to remedy these deficiencies will effectively mitigate or remediate such deficiencies. We also can give no assurance that our independent registered public accounting firm will agree with our management's assessment.

Management has discussed these matters with our independent registered public accounting firm, our Audit Committee and our Board of Directors.

Thus, the Individual Defendants have admitted that the Company lacked adequate internal controls, and that the failure to establish adequate internal controls proximately caused the Company to overstate its earnings for 4Q 2004, and for fiscal year 2004.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

34.    Plaintiff hereby incorporates all proceeding paragraphs as if fully set forth herein.

35.    Plaintiff brings this action derivatively in the right hand for the benefit of Audible

to redress injuries suffered and to be suffered by Audible as a result of the breaches of fiduciary duty and other violations of law by the Individual Defendants.

36.    Plaintiff is an owner of Audible common stock and was an owner of Audible common stock at all times relevant hereto.

37.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.  Plaintiff has retained counsel experienced in this type of litigation.

38.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action.  Such demand would be futile and useless gesture for the following reasons:

A.    For the reasons set forth herein, there is a substantial likelihood that all of the Individual Defendants (particularly the directors on the Audit Committee) will be held personally liable for their breaches of fiduciary duties, and therefore all of the Individual Defendants are incapable of independently and disinterestedly considering a demand to commence this action;

B.    As set forth herein, all of the Individual Defendants have issued statements which demonstrate that they would be hostile to this action;

C.    The Company's directors' and officers' liability insurance coverage prohibits directors from bringing suits against each other.  Thus, if the Individual Defendants caused the Company to sue its officers and directors for the liability asserted in this case, they would not be insured for that liability.  They will not do this to themselves.  The Company's officers' and directors' liability insurance was purchased and paid for with corporate funds for the protection of the corporation.  This derivative action does not trigger the "insured vs. insured" exclusion,

14

and therefore only this derivative action can obtain a recovery from the Company's officers' and directors' insurance for the benefit of the corporation.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH
### FOR FAILURE TO ESTABLISH ADEQUATE INTERNAL CONTROLS

39.    Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

40.    As alleged in detail herein, each of the Individual Defendants(and particularly the CEO the CFO, and the members of the Audit Committee) had a duty to Audible and its shareholders to establish and maintain adequate internal controls to ensure that the Company's could comply with all applicable rules and regulations, including but not limited to, the Sarbanes-Oxley Act of 2002.

41.    The Individual Defendants abdicated their responsibility to establish and maintain adequate internal accounting controls at Audible, having made no good faith effort to fulfill their duties in a timely manner. In fact, the Individual Defendants have admitted, *inter alia*, that the Company has lacked and continues to lack adequate internal controls.

42.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Audible has suffered damages, as alleged herein.

## COUNT II

### AGAINST ALL INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY Of GOOD FAITH FOR DISSEMINATION
### OF MISLEADING AND INACCURATE INFORMATION

43.    Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

15

44.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Audible disseminated accurate, complete and truthful information to the Market.

45.     Each of the Individual Defendants violated the fiduciary duty of good faith by causing or allowing the Company to disseminate to the Market materially misleading and inaccurate information through public statements, including, but not limited to, press releases and  SEC filings.

46.      As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Audible has suffered damages, as alleged herein.

**COUNT III**

**AGAINST DEFENDANTS KAPLAN AND KATZ FOR BREACH OF
FIDUCIARY DUTY OF LOYALTY AND GOOD FAITH FOR
INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

47.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

48.     At the time of the stock sales set forth herein, defendants Kaplan and Katz knew the  proprietary, non-public information described in paragraph 26 above.

49.     The information described in paragraph 26 was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Kaplan and Katz used for their own benefit when they sold Audible common stock in the Secondary Offering.  Kaplan and Katz' sales of Audible common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith, which has caused Audible to suffer damages.

50.     Since the use of the Company's proprietary information for their own gain

16

constitutes a breach of Kaplan and Katz' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Kaplan and Katz obtained thereby.

WHEREFORE, plaintiff demands judgment as follows:

      A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

      B.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      C.    Granting such other and further relief as the Court deems just and proper.

Dated: April 26, 2005             Respectfully submitted,

                    **TRUJILLO RODRIGUEZ & RICHARDS, LLC**

                    By: _Lisa J. Rodriguez_
                    Lisa J. Rodriguez (LR6767)
                    8 Kings Highway West
                    Haddonfield, NJ 08033
                    (856) 795-9002

**Of Counsel:**
Robert B. Weiser
The Weiser Law Firm, P.C.
121 N. Wayne Ave., Suite 100
Wayne, PA 19087
Telephone: 610/225-2616
Fax: 610/225-2677

Bruce G. Murphy
Law Offices of Bruce Murphy
265 Llwyds Lane
Vero Beach, FL 32963
Telephone: 561/231-4202
Fax: 561/231-4042

## AUDIBLE, INC. VERIFICATION

I, BRIAN EBNER _____, hereby verify that I am familiar with the

allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the

foregoing is true and correct to the best of my knowledge, information and belief

DATE: 4/25/05